UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

SCOTTY POWELL and
REBECCA POWELL,

      Plaintiffs,

v.                                     Civil Action No. 2:11-00335

BANK OF AMERICA, N.A. d/b/a
BANK OF AMERICA HOME LOANS f/k/a
COUNTRYWIDE HOME LOANS, INC.,
BAC HOME LOANS SERVICING, LP and
BANK OF NEW YORK MELLON, N.A.,

      Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending is the motion for summary judgment of the defendants Bank of America, N.A., ("Countrywide"), BAC Home Loans Servicing, LP ("BAC") and Bank of New York Mellon, N.A. ("Mellon"), filed January 9, 2012.  For the reasons set forth below, defendants' motion is granted in part and denied in part.


I.  Background


      This action arises out of a consumer credit transaction entered into by plaintiffs in connection with a deed of trust loan on residential property located in Boone County, West Virginia.  The recitation of facts that follows is taken in the light most favorable to the non-movant.

Around October 2006, plaintiffs sought financing from defendant Countrywide for the purchase of a new residence at 132 Summit Drive, Madison, West Virginia.  (Second Am. Compl. ¶ 7). To that end, plaintiffs hired realtor Debbie Peters to help them find and purchase a home.  (R. Powell dep. 37-38).  Peters recommended that plaintiffs use Countrywide for financing.  (<u>Id.</u> at 38).

Plaintiffs applied for a loan over the phone and discussed its terms with a Countrywide agent, Matthew Barker. (<u>Id.</u>).  Plaintiffs asked for a loan with principal and interest payments that ranged between $500 and $630, exclusive of taxes and insurance.  (S. Powell dep. at 10).  Barker provided plaintiffs with a loan option that provided for $587.35 principal and interest payments and was "consistent with the range" plaintiffs requested.  (<u>Id.</u> at 11).  Plaintiffs claim that, prior to closing, Barker told them that their interest rate would not be higher than 12.25%, and that they would be able to refinance in a year as long as plaintiffs "had good standing term [sic] in [their] payments."  (<u>Id.</u> at 26).

The closing occurred on November 3, 2006.  (Second Am. Compl. at ¶¶ 12, 13(a)).  At the closing, which lasted only

2

10 to 15 minutes, the Powells contend that they were instructed where to sign and initial, and were given "no meaningful opportunity" to understand the terms of the transaction.  (R. Powell dep. at 15; S. Powell dep. at 20).  When asked if he recalled reading the adjustable rate note, Scotty Powell testified that they were told by their relator, Peters, that "everything is on [the papers] that you all discussed, just sign it down where it says to sign."  (S. Powell dep. at 23).  He further described the closing as follows: "I glanced down it because, again, this is how the, the signing went down.  We went in, we sat down, the Realtor - the Realtor more or less - the representative give the Realtor the papers and she said we'll get out of here because we all got places to go."  (<u>Id.</u>).

        Even so, it is undisputed that at the closing, plaintiffs signed a document titled "ADJUSTABLE RATE NOTE," which disclosed that their interest rate was subject to change after the first two years.  (Def.'s Motion for Summary Judgment, Ex. C, Adjustable Rate Note (the "Note")).  The first page of the Note states in all capital letters, as follows:

> THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT.  THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

3

(Note at 1). According to the Note, the interest rate would
never be greater than 19.250% or less than 12.250%. (<u>Id.</u> at ¶
4(D)).

In their deposition testimony, plaintiffs concede that
had they read the various closing documents, including the Note,
they would have understood the adjustable rate provisions. (R.
Powell dep. at 26; 44-45; S. Powell dep. at 20, 25; id. at 23
("So I knowed it was adjustable, yes, sir, I did. I knowed it
was adjustable but it wasn't supposed to go up, it was supposed
to go down then we could refinance after a year.")). In this
connection, plaintiffs testified that at the closing, their
realtor, Peters, represented that their interest rate could
change but that it would never go over 12.25%. (<u>Id.</u> at 23).
Yet, at the closing, plaintiffs executed an Adjustable Rate
Rider to the Deed of Trust (the "Rider"), disclosing that
plaintiffs' interest rate under the Note could adjust upwards.
(Rider at 1-2).

The Loan Application signed by plaintiffs lists the
monthly payment breakdown, including principal and interest
payments, as well as other expenses. (Loan Application at 2).
The Powells reviewed it prior to signing the Loan Application

4

and knew and understood that, in addition to the monthly payments of principal and interest, they would be responsible for paying hazard insurance premiums and real estate taxes. (R. Powell dep. at 45; S. Powell dep. at 12).

Under the Deed of Trust, which plaintiffs executed at closing, they are responsible for paying "all taxes, assessments, charges, fines, and impositions attributable to the Property" and shall maintain hazard insurance coverage. (Deed of Trust ¶¶ 4-5). The Deed of Trust further provides that if plaintiffs fail to supply the lender with evidence of hazard insurance, "Lender may purchase insurance at Borrower's expense to protect its interest in Borrower's Property." (Id. at ¶ 29). In accordance with these provisions, plaintiffs obtained a hazard insurance policy and began making payments on it. (S. Powell dep. at 12). Also at closing, plaintiffs signed a HUD-1 Settlement Statement disclosing all of the origination and closing fees. (HUD-1 Settlement Statement).

Nine months after closing, on August 10, 2007, Countrywide informed plaintiffs in writing that their fixed interest rate was extended from two years to five years, that is, until August 10, 2012. (Fixed Interest Extension Letter).

Plaintiffs do not doubt that they received this letter and do not dispute that the letter again disclosed that their interest rate could adjust.  (R. Powell dep. 60-61).

In 2007, plaintiffs fell behind on their mortgage payments.  (R. Powell dep at 48; S. Powell dep at 7; Deloney dep. at 17).  Moreover, plaintiffs failed to produce any proof of hazard insurance coverage after November 3, 2007, despite their ongoing duty to provide evidence of such insurance to the lender as required by the Deed of Trust.  (Deed of Trust ¶¶ 4-5).  Consequently, Countrywide had to purchase lender-placed hazard insurance to protect its security interest in the Property on or around October 27, 2007.  (S. Premabhandra dep. at 13).  Countrywide also had to pay the real estate taxes on the Property.  (S. Powell dep. at 15).

As a result of the missed principal and interest payments, hazard insurance premiums and real estate taxes, plaintiffs' total monthly payments increased from $587 to $658. (Deloney dep. at 17; S. Powell dep. at 53).  Plaintiffs subsequently defaulted on these monthly payments.  (R. Powell dep. at 56-57).

Around July 2008, plaintiffs sought a reduction of the interest rate, but were refused.  (Second Am. Compl. at ¶ 14).  Plaintiffs then applied for a loan modification around the same time period.  (Id. ¶ 17).  BAC approved plaintiffs' loan modification request and on September 30, 2009, plaintiffs entered into a loan modification agreement (the "Modification").  Pursuant to the terms of the Modification, BAC brought the Loan current, helped plaintiffs to avoid foreclosure, and reduced the interest rate to a fixed rate of 11.25%, a substantial decrease from the original adjustable rate of 12.25% - 19.25%.  (Modification at ¶¶ 1-4; Deloney dep. at 30, 40).  The Modification did not alter any other terms of the Note and Deed of Trust, including plaintiff's obligation to pay hazard insurance premiums or real estate taxes.  (Modification at ¶ 10).

Enclosed in the mailing that contained the Modification was a disclosure stating that the new monthly payment of $628.11 did not include any escrow items, such as hazard insurance premiums or real estate taxes for which plaintiffs remained responsible under the loan documents.  (Def.'s Mem., Ex. M, Disclosure).  Plaintiffs understood that in addition to their monthly payments they were responsible for the

7

real estate taxes and insurance.  (R. Powell dep. at 53).
Ultimately, the Powells concede they breached the Modification
by refusing to make any payments pursuant to it.  (<u>Id.</u> at 52-
53).

On at least two occasions, once in or around February
2010 and again in March, plaintiffs allege that a BAC agent
"visited plaintiff's home" and left them with a note stating
that it was "'Urgent! Urgent! Urgent! Urgent!'" that plaintiffs
call BAC.  (<u>Id.</u> ¶ 26).

By letter dated February 18, 2010, plaintiffs
requested a copy of their account history, information regarding
the holder of the loan, and informed BAC that they were
represented by counsel, to whom further communication was to be
directed.  (<u>Id.</u> ¶ 27(a)).  BAC received plaintiffs' letter on
February 24, 2010.  (<u>Id.</u> ¶ 27(b)).  In response to their letter,
plaintiffs received an incomplete payment history and no
information regarding the holder of the loan.  (<u>Id.</u> ¶ 27(c)-
(d)).

Despite being informed that plaintiffs were
represented by counsel, BAC contacted plaintiffs on at least the

following four occasions seeking to collect on the loan:  on or about April 14, 2010, at approximately 8:45 p.m.; on or about April 24, 2010; on or about May 28, 2010, at approximately 8:02 p.m.; and on or about May 29, 2010.  (Id. ¶ 27(e)).[1]

On June 28, 2010, plaintiffs filed a complaint in the Circuit Court of Boone County, West Virginia, against defendants Countrywide and BAC, and against Hometown Real Estate, Inc., Rosanna Trent, and "John Doe Holder." (Notice of Removal ¶ 1). On April 13, 2011, plaintiffs filed an amended complaint ("First Amended Complaint") against defendants Countrywide, BAC, Zamow, and "John Doe Holder."  On May 12, 2011, Countrywide and BAC filed a notice of removal on diversity grounds.[2]  On August 24, 2011, the court granted plaintiff's motion to amend their First Amended Complaint in which Bank of New York Mellon, N.A., was

_____

[1] Plaintiffs do not describe the method by which agents of defendant BAC allegedly contacted plaintiffs, though one may presume it was by telephone.

[2] In paragraph 5 of the Notice of Removal, defendants aver that they had not at that time been served with plaintiffs' amended complaint.  Rather, defendants state, on April 29, 2011, defendants "received a courtesy copy of the Amended Complaint from Plaintiffs' counsel via electronic mail."  Notice of Removal at ¶ 5.  Plaintiffs do not challenge that removal was timely.

substituted as a defendant for "John Doe Holder."  ("Second
Amended Complaint").

         In a memorandum opinion and order dated February 2,
2012, the court, <u>inter</u> <u>alia</u>, dismissed Zamow as a defendant and
dismissed Counts IV and V.  <u>See</u> <u>Powell v. Bank of America</u>, __ F.
Supp. 2d __, 2012 WL 315877 (S.D. W. Va. Feb. 2, 2012).  Of the
remaining counts, defendants now move for summary judgment on
Counts I and II (fraud), III (unconscionable contract), and VIII
(illegal debt collection against BAC).  Counts VI and VII,
alleging illegal debt collection against BAC, remain unaffected
by defendants' motion.

                 II.    Motion for Summary Judgment

A.   Governing Standard

         A party is entitled to summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  Material facts are
those necessary to establish the elements of a party's cause of

action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts,

11

summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

B.   Counts I and II: Fraud

Defendants principally contend that plaintiffs' fraud claims are time-barred by the two-year statute of limitations, West Virginia Code § 55-2-12, and the doctrine of laches.

Defendants also assert that, to the extent plaintiffs invoke the discovery rule, it is inapplicable.

In Count I, plaintiffs allege that defendants "suppressed from the Plaintiffs material terms" of the loan, including an "adjustable rate mortgage" and further "misrepresented that Plaintiffs' payments and interest rate would not increase."  (Second Amend. Compl. at ¶¶ 30-31).  They seek only damages for the conduct alleged.[3]

The statute of limitations begins to run, pursuant to the discovery rule,

> when the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that the plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury.

Syl. pt. 3, Dunn v. Rockwell, 689 S.E.2d 255, 258 (W. Va. 2009) (quoting Syl. pt. 4, Gaither v. City Hospital, Inc., 487 S.E.2d 901 (W. Va. 1997)).  "[W]hether a plaintiff 'knows of' or 'discovered' a cause of action is an objective test."  Syl. pt.

---

[3] Inasmuch as the Count I fraud claim requests only damages -- a legal remedy -- the two-year statute of limitations period set forth in W. Va. Code § 55-2-12 governs.  See Brown v. Cmty. Moving & Storage, Inc., 455 S.E.2d 545, 547 n. 3 (W. Va. 1995).

13

4, in part, id. at 258.  That is, "the plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action.  This objective test focuses upon whether a reasonable prudent person would have known, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action."  Id.

In this case, the alleged misrepresentations and acts of suppression occurred prior to closing.  That is, over the course of several telephone calls, an agent of Countrywide is said to have explained to Mr. Powell that the loan interest rate would only adjust down and would never go up.  (R. Powell dep. at 8; 20).  Even assuming the truth of these assertions, several loan documents signed by plaintiffs at closing on November 3, 2006, conspicuously disclosed that the interest rate could adjust upwards.  The Note, which plaintiffs executed at closing, states in all capital letters and bold font on the face of the document that the interest rate and payments can change, and further discloses in lower case letters and regular font that the interest rate can range between 12.25% and 19.25%.  (See Note at 1-2).  Plaintiffs also signed the Rider, which includes the following phrase in all capital letters and bold font: "This note contains provisions allowing for changes in the interest

**14**

rate and monthly payments." (Rider at 1).[4] Plaintiffs thus should have been aware of their Count I fraud claim at closing, well over three and a half years prior to the commencement of this action in June 2010. The Count I fraud claim is barred by the statute of limitations.

Plaintiffs nevertheless assert that summary judgment is inappropriate inasmuch as "they did not read or understand those documents and did not know that their loan contained an interest rate that could adjust upwards." (Pl.'s Response at 6). In West Virginia, however, contracting parties are presumed to be aware of the contents of the documents they sign. See Reddy v. Cmty. Health Found., 289 S.E.2d 906, 910 (W. Va. 1982) (explaining that the failure to read a contract before signing it does not excuse a person from being bound by its terms and stating that "[a] person who fails to read a document to which he places his signature does so at his peril").

---

[4] Nine months after closing, in August 2007, plaintiffs were again reminded that their interest rate could change when Countrywide granted plaintiffs an extension of the fixed rate period until 2012. (R. Powell dep. at 60-61; Extension Letter).

The Count II fraud claim rests on the allegation that "Defendants misrepresented that Plaintiffs would be able to refinance after one year of making payments on their mortgage loan." (Second Amend. Compl. at ¶ 37). The complaint also alleges that the Countrywide loan agent told plaintiffs that "they could refinance at a lower interest rate after one year" (id. at ¶ 11), and, furthermore, that "[p]laintiffs inquired with Defendant about the promised reduction in interest rate after one year and Defendant refused." (Id. at ¶ 14). The Count II request for "equitable relief," though unspecified, requires application of the doctrine of laches. (Second Am. Compl. ¶ 40). See Syl. pt. 7, Dunn, 689 S.E.2d at 258-59; see also White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990) (laches is "properly relevant only where the claims presented may be characterized as equitable, rather than legal").

"The elements of laches consist of (1) unreasonable delay and (2) prejudice." Province v. Province, 473 S.E.2d 894, 904 (W. Va. 1996). "Mere delay will not bar relief in equity on the ground of laches. 'Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right.'" Syl pt. 1, Smith v. Abbot, 418 S.E.2d 575 (W. Va.

16

1992).  It has also been observed that, "[a]lthough the doctrine of laches is not bound by any statute of limitations, the statute of limitations is one measure of whether a claim has become stale.  Laches and statutes of limitations are analogs." Province, 473 S.E.2d at 904 n. 21.[5]

Defendants argue that plaintiffs' delay in waiting more than two years to assert their fraud claim, even after it was discovered by late 2007, is unreasonable, and that the delay prejudices defendants because the employee who made the alleged verbal misrepresentations, Matthew Barker, has left defendants'

_____

[5] The Supreme Court of Appeals has explained that

[w]ith respect to claims for equitable relief, a court of equity will normally invoke the maxim of equity which states that 'equity follows the law' and will generally look first to what the statute of limitations would be for any analogous right or remedy at law.  However, a court of equity, in examining the delay in asserting a claim for equitable relief, is not bound by any analogous statute of limitations.  In a given case involving equitable relief which is alleged to be barred by laches, the analogy of the statute of limitations may be applied; or a longer period than that prescribed by the statute may be required; or a shorter time may be sufficient to bar the claim for equitable relief.

Maynard v. Bd. of Edu. of Wayne Cnty., 357 S.E.2d 246, 254 (W. Va. 1987)

employ.  Even had he not left, defendants contend, "his recollections of events are bound to be faded and of little use," thus warranting the conclusion that plaintiffs waived their right to assert their claim now.  (Def.'s Reply at 5). This is particularly critical, defendants note, inasmuch as plaintiffs' entire fraud case against them rests on the Powells' assertions that Mr. Barker fraudulently induced them to agree to the loan by promising an interest rate that would never increase.  Plaintiffs respond that their delay in bringing about the claim was not unreasonable inasmuch as defendants were actively working with them on loss mitigation efforts from late 2007 until September 2009.

As defendants point out, even after the loan modification was signed on September 20, 2009, plaintiffs refused to make a single payment pursuant to it.  Moreover, it was only after their property was referred for foreclosure that plaintiffs first asserted their fraud claims seeking equitable relief.  (Id. at 6).[6]  In view of the circumstances surrounding

_____

[6] Defendants further state that plaintiffs "have been living in their property for the past four years without making any payments on it and without pursuing their lawsuit until they were threatened with foreclosure.  Plaintiffs should not be

(contin.)

18

plaintiffs' conduct -- including the more than two-year delay in asserting their claims despite having knowledge of the underlying facts, together with the real potential for prejudice to defendants' defense of their case -- the court concludes that plaintiffs' Count II fraud claim is barred by the doctrine of laches.

In light of the court's conclusion that the fraud claims are plainly precluded by the statute of limitations and laches, the court need not address defendants' additional contentions, namely, that plaintiffs failed to establish at least three elements of fraud in each Counts I and II.

C.   Count III: Unconscionable Conduct

The count of unconscionable contract states as follows:

> 42. The Defendants have engaged in a pattern of predatory lending practices.
>
> 43. The Plaintiffs are unsophisticated consumers with little understanding of financial matters.
>
> 44. The Plaintiffs were induced into the loan through misrepresentations and suppressions of terms, and were

permitted to game the system and assert their claims now." (Def.'s Reply at 6).

not afforded a meaningful opportunity to understand
the essential elements of the transaction.

45. The loan agreement contained the following unfair
terms, which amounted to an unfair surprise to the
Plaintiffs:

(a) excessive closing costs and fees, including
but not limited to, bogus recording and document
preparation fees;

(b) an exploding ARM loan, which could adjust
upward to over 19%, but which could never decrease
below the initial rate of 12.25% that was not
explained and that was contrary to representations
made prior to and at closing.

46. The agreement provided to the Plaintiffs was
induced by unconscionable conduct and contains unfair
terms, under all circumstances alleged, and therefore
is unenforceable pursuant to section 46A-2-121 of the
West Virginia Code.

(Compl. §§ 42-46).

Plaintiffs allege that the loan was unconscionable, in

violation of West Virginia Code § 46A-2-121.  That section

provides a remedy for consumers who have entered into consumer

loans that contain unconscionable terms or were induced by

unconscionable conduct.  It prescribes in relevant part:

(1) With respect to a transaction which is or gives
rise to a consumer credit sale, consumer lease or
consumer loan, if the court as a matter of law finds:

(a) The agreement or transaction to have been
unconscionable at the time it was made, or to
have been induced by unconscionable conduct, the
court may refuse to enforce the agreement, or

20

> (b) Any term or part of the agreement or
> transaction to have been unconscionable at the
> time it was made, the court may refuse to enforce
> the agreement, or may enforce the remainder of
> the agreement without the unconscionable term or
> part, or may so limit the application of any
> unconscionable term or part as to avoid any
> unconscionable result.

W. Va. Code § 46A-2-121.

"Whether a particular term in a contract is
unconscionable often depends on the circumstances in which the
contract was executed or the fairness of the contract as a
whole, and therefore [the] analysis necessarily includes an
inquiry beyond the face of the contract." Troy Mining Corp. v.
Itmann Coal Co., 346 S.E.2d 749, 753 (W. Va. 1986).  West
Virginia courts further instruct that the unconscionability
determination "must focus on the relative positions of the
parties, the adequacy of the bargaining positions, and the
meaningful alternatives available" to the plaintiff.  Art's
Flower Shop, Inc. v. Chesapeake & Potomac Tel. Co., 413 S.E.2d
670, 675 (W.Va.1991); see also Hager v. Am. Gen. Fin., Inc., 37
F. Supp. 2d 778, 786 (S.D. W. Va. 1999).  However, it is
fundamental that:

> [a] bargain is not unconscionable merely because the
> parties to it are unequal in bargaining position, nor
> even because the inequality results in allocation of
> risks to the weaker party.  But gross inadequacy in
> bargaining power, together with terms unreasonably

> favorable to the stronger party, may confirm
> indications that the transaction involved elements of
> deception or compulsion or may show that the weaker
> party had no meaningful, no real alternative, or did
> not in fact assent or appear to assent to the unfair
> terms.

Troy Mining Corp., 346 S.E.2d at 753 (quoting Restatement
(Second) of Contracts § 234 cmt. d (1970)).

Here, plaintiffs offer no evidence indicating the closing fees were "excessive." As noted above, plaintiffs also concede that the adjustable interest rate was disclosed on the face of the loan documents at the time of closing. The Powells acknowledge that they knew at the time of closing that their initial interest rate would be 12.25%, and they do not claim that such a rate was unfair. (R. Powell dep. 39-40; S. Powell dep. 26). Moreover, plaintiffs do not claim, and no evidence suggests, that defendants in any way denied them the opportunity to read or ask questions about the closing documents. (R. Powell dep. at 44-45; S. Powell dep. 20, 25).

Plaintiffs also allege that they are unsophisticated consumers, and rely on testimony from Mrs. Powell stating that the transaction was the first mortgage loan she ever obtained,

22

and that she did not always understand what defendants were communicating to her.  (R. Powell 21:4-10, 25:11-13, 37:14-16).[7] She further testified that no one told her what the closing documents meant, and that they "just went by what we was told." (Id. at 22-23).[8]

While the Powells may not be sophisticated consumers, plaintiffs present no evidence that they were compelled to agree to the transaction, that they were unable to secure financing through other avenues, or that the terms as actually set forth in the various agreements, including the adjustable rate, were patently unfair.  Even so, plaintiffs again direct the court to the alleged statements made by the agent for Countrywide prior to closing in which the agent told plaintiffs that their adjustable rate would never increase.  This disputed testimony, if true, evidences deception and is barely enough to allow

_____

[7] Mr. Powell, though, had previously financed a trailer. (R. Powell. 21:7-10).

[8] Mrs. Powell states that she graduated from high school, and in response to a question as to whether she can read and write, she answered "Yes, just fine."  (Id. at 21:1-3).

plaintiffs to survive summary judgment on their count of

unconscionable contract.[9]

D.    Count VIII: Illegal Debt Collection

        Plaintiffs allege that on two occasions an agent of

BAC visited them and left a note asking plaintiffs to call BAC

urgently, and that by doing so BAC violated West Virginia Code §

46A-2-129a.  (Second Am. Compl. ¶ 26).  Defendants advance the

argument that the "Urgent!" note left at the plaintiffs'

residence does not constitute a violation under the plain

language of § 46A-2-129a, which provides that "No debt collector

shall place a telephone call or otherwise communicate by

telephone with a consumer . . . falsely stating that the call is

'urgent'. . . ."  Inasmuch as the plain language of the statute

_____

        [9] Plaintiffs argue that unconscionability cannot be
determined at the summary judgment stage in this case inasmuch
as plaintiffs have not yet had an opportunity to fully present
evidence on this issue to the court.  In West Virginia,
unconscionability is a question of law to be determined based on
the factual circumstances of the case.  While the court does not
accept plaintiffs' suggestion that summary judgment is
inappropriate with respect to a determination of
unconscionability, the court, viewing the evidence in the light
most favorable to plaintiffs, does find that a question of fact
exists as to whether the alleged misrepresentation as to the
adjustable rate was so deceptive as to render the transactions
between plaintiffs and defendants unconscionable.

24

applies only to telephone calls and no other method of communication, plaintiffs' Count VIII claim is without merit. Accordingly, defendants are granted summary judgment as to Count VIII.[10]

### III.    Conclusion

Based on the foregoing reasons, it is ORDERED that defendants' motion for summary judgment be, and it hereby is, granted as to Counts I, II, and VIII and denied as to Count III.

In sum, Counts III (unconscionable contract against all defendants) and Counts VI and VII (illegal debt collection against BAC) remain.

_____

[10] The court notes that in their response memorandum, plaintiffs state that they voluntarily dismiss Count VIII, inasmuch as "the allegations in Count VIII are more appropriately addressed by Counts VI and VII, stating claims pursuant to West Virginia Code sections 46A-2-128(e) & -128." (Pl.'s Response at 4 n.1).  In view of the disposition of this claim on defendants' motion for summary judgment, plaintiffs' attempt to voluntarily dismiss Count VIII is moot.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

Enter: April 5, 2012

John T. Copenhaver, Jr.
United States District Judge